**MAZAL GROUP INC.**
**RIGHT TO SELL LICENSING AGREEMENT – PHYSICAL RETAIL ONLY**

This Right to Sell Licensing Agreement ("Agreement") is made by and between Mazal Group Inc. ("MG"), a California corporation with its principal place of business at 20255 Corisco Street, Chatsworth California 91311, and ___Emmanuel Frost___ ("Licensee"), a(n) ___individual___, with its principal place of business and/or residence at ___6060 Whitegate Crossing, East Amherst, NY___ with ___14051___ reference to the following facts.

### RECITALS

A.  MG, on behalf of its clients, provides licensees with access to high-end skincare and cosmetics products (the "Products" or "MG Products") for sale to retail customers through approved physical retail locations. As part of access to the Products, MG has license to use and sub-license various intellectual property and trade secrets associated with the ___Lionesse___ brand, including but not limited to the trademarks referenced in Exhibit A, to licensees ("Licensed IP") for use in the sale of MG Products at approved physical retail locations.

B.  Licensee operates a _____Retail Store / _____Kiosk / __x__Cart located at ("MG Licensed Location(s)" or "Licensed Location(s)"):

    a.  ___Eastern Hills Mall – Williamsville, NY___

    b.  _____

    c.  _____

    d.  _____

    e.  _____

    f.  _____

C.  Licensee desires, upon the terms and conditions set forth herein, to obtain a license to sell, offer for sale, or otherwise advertise MG Products solely at the MG Licensed Location(s) expressly designated herein.  Licensee acknowledges that it is essential to the preservation of the integrity of the Licensed IP, and the goodwill of MG Products, that Licensee maintain and adhere to certain standards, procedures, and policies described hereinafter.

D.  MG is willing, upon the terms and conditions set forth herein, to license to Licensee the right to sell MG Products, as well as utilize the Licensed IP, at the MG Licensed Location(s) expressly designated herein.

NOW THEREFORE, in consideration of the promises and the mutual provisions herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**1.  GRANT OF RIGHT TO SELL.**

1.01.  <u>Grant of Right to Sell</u>. Subject to all of the terms and conditions herein, MG grants to Licensee the non-exclusive, non-transferrable, non-divisible, and revocable license to use the Licensed IP and right to sell, offer for sale, or otherwise advertise MG Products solely at the MG Licensed Location(s) listed in this Agreement.  Licensee may not change the Licensed Location(s), except with MG's prior written consent, which MG may grant or withhold in its sole discretion. Regardless of whether the Licensee changes its Licensed Location(s), it will remain obligated for all liabilities and obligations arising out of or in connection with any prior locations.

1.02.  <u>Authorized Products</u>.  Licensee shall only sell, offer for sale, or otherwise advertise at the MG Licensed Location(s) MG Products which Licensee has purchased directly from MG.  Sale, offers for sale, or advertising at the Licensed Location(s) of any MG Products acquired through any other means by Licensee is strictly prohibited and considered a material breach of this Agreement.

1.03.  <u>Authorized Sales Channels</u>.  Licensee shall only sell, offer for sale, or otherwise advertise MG Products at the MG Licensed Location(s). Sale, offers for sale, or advertisement of MG Products via other sales channels including, but not limited to online, wholesale or distribution channels, or transfer of bulk quantities of Products at reduced cost is strictly prohibited and considered a material breach of this Agreement. **This Agreement is only for retail sales direct to end-use consumers at the Licensed Location(s). Licensee is not authorized to sell, list, advertise or otherwise market MG Products online, either directly or indirectly.  Licensee is not authorized to sell MG Products to other resellers, wholesalers, bulk quantity purchasers at reduced cost, or any other person, company, or entity other than sales direct to end-use consumers at the Licensed Location(s).  Licensee is not authorized to sell, list, advertise or otherwise market MG Products in bulk quantities at reduced cost to end-use consumers at the Licensed Location(s)**.  Any sale, offers for sale, or advertising of (i) MG Products at an unauthorized location other than the Licensed Location(s); (ii) MG Products online, either directly or indirectly; (iii) MG Products to another reseller, wholesaler or similar purchaser of bulk quantities at reduced cost; or (iv) MG Products obtained through unauthorized channels of distribution other than MG (each of (i), (ii), (iii), and (iv) an "Unauthorized Sale"), shall be considered a material breach of this Agreement and may expose Licensee to damages at law, equity, including but not limited to the liquidated damages provision contained in this Agreement.

Licensee shall operate the MG Licensed Location(s) in conformity with all applicable laws and regulations.  As part of this Section, but not in limitation of, Licensee shall undertake to maintain at its own expense and responsibility any and all product certification requirements as are necessary for the lawful sale of all Products.

**2.  TERM**.  This Agreement shall take effect upon the Effective Date and its term shall extend until terminated pursuant to **Section 8** hereof.

**3.  LICENSED IP/MARKETING MATERIALS**.  Licensee expressly acknowledges that MG is the sole and exclusive licensor of the Licensed IP. Licensee's rights of usage under this Agreement only extend to the Licensed IP for the sole purpose of promoting or facilitating Licensee's sale of MG Products exclusively within the MG Licensed Location(s) specified herein.  In no event shall this license to Licensee extend to

1

 Initials

display, upload, or other use of the Licensed IP in connection with any website, social media account, or other online presence used by Licensee. Licensee shall not represent in any manner that Licensee has acquired any ownership rights in the Licensed IP, and shall designate the Licensed IP with any ownership notices as may be prescribed by MG from time to time. Licensee shall not use any of the Licensed IP or any marks, names, or indicia which are or may be confusingly similar to the Licensed IP in Licensee's own entity or business name.  Licensee shall not apply for or register any copyrights, trademarks, domain names, or any other official government filings for any marks, names, or indicia which are or may be confusingly similar to the Licensed IP.  Licensee further acknowledges and agrees that any and all goodwill associated with the MG Products, and identified by the Licensed IP shall inure directly and exclusively to the benefit of their respective owners as communicated by MG and that, upon the expiration or termination of this Agreement for any reason, no monetary amount shall be assigned as attributable to any goodwill associated with Licensee's use of the Licensed IP.  Licensee understands and agrees that any use of the Licensed IP other than as expressly authorized by this Agreement, without MG's prior written consent, is an infringement and material breach of MG and their respective Licensed IP owners' rights therein and that the right to use the Licensed IP granted herein does not extend beyond the termination or expiration of this Agreement

Licensee shall make full use of all advertising, marketing, and promotional material supplied directly by MG. Licensee shall not be permitted to use any advertising, marketing, or promotional material not directly supplied by MG without MG's prior express written consent.   In all advertising and promotion of the MG Products, Licensee shall comply with MG's standard advertising policies and requests as may be specified from time to time, including but not limited to the exclusion from use of specific advertising, marketing, or promotional materials even if such materials were originally supplied to Licensee by MG.  Licensee shall bear all the advertising, marketing, and promotion costs and all business expenses incurred by it in marketing, promoting, advertising and selling the MG Products.

**4.   MINIMUM ADVERTISED PRICING (MAP)**.      From time to time MG may establish minimum advertised pricing for certain Products, for certain customers and/or for certain situations. Licensee shall adhere to such minimum advertised pricing as so established by MG ("MAP Guidelines"), including but not limited to prices advertised by MG on its corporate website, provided that Licensee shall not be required to sell Products at any particular price or at or above any minimum price if such a requirement would be unlawful.

**5.   PRODUCT SERIAL NUMBERS**.      Licensee hereby acknowledges that any or all MG Products may be marked with a unique serial number for tracking and enforcement purposes, and expressly agrees that certain Products and serial numbers may be directly assigned to Licensee. Licensee further acknowledges that tampering with Product serial numbers is a criminal offense punishable by fine and imprisonment.  MG reserves the right to divulge any counterfeit or tampered products to law enforcement channels when required.  Licensee shall not in any manner or form tamper with any MG Products sold to Licensee, including but not limited to the alteration or concealment of Product serial numbers. *LICENSEE HEREBY ACCEPTS FULL RESPONSIBILITY AND LIABILITY FOR ANY PRODUCT WITH LICENSEE'S ASSIGNED SERIAL NUMBER(S) THAT IS TAMPERED WITH OR SOLD THROUGH UNAUTHORIZED CHANNELS, INCLUDING BUT NOT LIMITED TO, SALES IN VIOLATION OF SECTIONS 1.02 AND 1.03 OF THIS AGREEMENT*.

**6.   CONFIDENTIALITY OF INFORMATION**.      Licensee, for itself, its employees, contractors, consultants, and agents, agrees to: (a) safeguard MG's Confidential Information with the same degree of care that Licensee uses to protect its own confidential information; (b) maintain the confidentiality of this information; (c) not use such information except as permitted under this Agreement; and (d) not disseminate, disclose, sell, publish, or otherwise make available this information to any third party without the prior written consent of MG.

For purposes of this Agreement, "Confidential Information" shall mean any and all information that is not publicly known, and that is disclosed to or discovered by Licensee in any form including but not limited to Trade Secrets, website designs, layouts, design concepts, trademarks, discoveries, ideas, facts, product development strategy and activity, corporate assessments and strategic plans, customer lists, financial and statistical information, accounting information, systems, processes, formulae, inventions, product specifications, data, know-how, graphs, samples, research and development, distribution methods, customer requirements, price lists, market studies, business plans, marketing plans, marketing methods, discoveries, policies, guidelines, procedures, practices, financial statements, projections, budgets, licenses, agreements, contracts, leases, surveys and marketing plans and information of MG. "Trade Secret" shall mean any information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, and shall include but is not limited to each of the following: Unique vendor information, customer lists, business methods, pricing information, product information, profit margin information, financial information, overhead information, cost information, purchasing information, personnel information, data compilations, processes, systems, cost information, designs, patterns, drawings, business relationships, business plans, business methods, manufacturing techniques, and manufacturing methods provided to Licensee by MG or discovered by Licensee by virtue of its relationship with MG whether such information is expressly disclosed to Licensee or otherwise.

**7.   TRANSFER AND ASSIGNMENT**.

7.01.   <u>Assignment by MG</u>. This Agreement and all rights and duties hereunder may be freely assigned or transferred by MG and shall be binding upon and inure to the benefit of MG's successors and assigns.

7.02.   <u>Transfer by Licensee</u>. Licensee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Licensee and that MG has granted the License in reliance on Licensee's personal background, business skills, experience, and financial capacity, it is important to MG that Licensee be known to MG and always meet MG's standards and requirements. Accordingly, Licensee shall not be permitted or have the power, without the prior written consent of MG, to make any Transfer or assignment.

Any Transfer that does not comply with the terms of this Section 7 shall be null and void.

**8.   DEFAULT AND TERMINATION**.

8.01.   <u>Termination by the Parties</u>. MG may terminate this Agreement at any time, for any and/or no reason, by providing written notice to Licensee of such termination.  Such termination by MG is effective immediately upon written notice being given to Licensee pursuant to Section 11 herein.  Licensee may terminate this Agreement upon two (2) months prior written notice to MG, so long as Licensee, up until the point of its written notice to MG, has fully performed on all its obligations under this Agreement and has not been in default or material breach of this Agreement.

8.02.   <u>Material Breach/Default by Licensee</u>. Without in any way limiting MG's termination rights in Section 8.01, or the general meaning of the terms "material breach" or "default," the following non-exhaustive list of occurrences shall constitute a material breach and/or default by Licensee allowing MG to terminate the Agreement and be entitled to the remedies outlined in Section 8.03:

8.02.1.   If Licensee makes, or has made, any false statement or report to MG in connection with this Agreement or the application therefore;

2

 Initials

8.02.2.   If License sells, offers for sale, advertises, or gives away any MG Products via online or other physical locations aside from the Licensed Location(s) defined in this agreement;

8.02.3.   If License sells, offers for sale, advertises, or gives away any MG Products to non end-use retail consumers including, but not limited to, wholesalers, distributors, or consumers purchasing bulk quantities at reduced cost;

8.02.4.   If Licensee engages in any Unauthorized Sale as defined in Section 1 of this Agreement; or

8.02.5.   If Licensee sells, offers for sale, advertises, or gives away any MG Products in violation of the MAP Guidelines as specified in Section 4 of this Agreement.

8.03.   Remedies to MG/Liquidated Damages.  If the Licensee is in default, in addition to the rights MG has to terminate the Agreement, the Licensee agrees to pay MG, among the many remedies available to MG (which MG does not waive by the exercise of any rights hereunder), a payment of $100,000.00 USD as liquidated damages.  Licensee and MG agree that these liquidated damages represent a reasonable estimate of MG's costs, expenses, and other damages and are a fair compensation to MG for the loss suffered by MG as a direct and proximate cause of Licensee's default.  MG shall be entitled to retain and have recourse to any bond, deposit, credit or advance previously deposited by Licensee under this Agreement to fulfill any liquidated damages MG is entitled to under this Section 8.03.

**BY INITIALING HERE ___EF___, LICENSEE ACKNOWLEDGES AND MAKES A PERSONAL GUARANTEE OF THE REASONABLENESS OF THIS SECTION AND THE ABILITY OF MAZAL GROUP TO SEEK ADDITIONAL RELIEF IF DEEMED APPROPRIATE FROM LICENSEE, OWNERS, OR ANY GUARANTORS.**

8.04.   Governing State Law.  If a different notice or cure period or default is prescribed by applicable California law, it shall apply to a termination of this Agreement.

8.05.   Waiver.  No failure on the part of the MG to exercise any power reserved to it by this Agreement or to insist on strict compliance with any obligation or condition under this Agreement will be considered to be a waiver of the right to exercise the power or to insist on compliance with the obligation or condition in the future.

**9.   POST TERMINATION OBLIGATIONS**.

9.01.   Post-Termination Obligations.  Upon the Termination of this Agreement by any means or for any reason, Licensee shall immediately:

9.01.1.   Discontinue all promotion, marketing and advertisement of the Products;

9.01.2.   Cease all display, advertising, and use of all Licensed IP related names, trademarks, logos, designations, and the Licensed IP, and agree to thereafter refrain from use, advertisement, or display such names, trademarks, logos, designations, or Licensed IP;

9.01.3.   Pay all sums owing to MG, with all outstanding invoices for Products accelerating and becoming immediately due and payable. Upon termination for any default by Licensee, such sums shall also include liquidated damages as specified in **Section 8**.  MG reserves the right to hold funds until the liquidated damages amount is completely paid, and can use such funds to offset the liquidated damages amount pursuant to Section 8.03 of this Agreement; and

9.01.4.   Notify MG of any orders or portions thereof remaining unshipped as of the effective date of the termination.  MG shall have the option to cancel all such orders or portions thereof.

9.02.   Right to Repurchase.  MG shall have the right, but not the obligation, to repurchase any amount of the entire remaining uncommitted inventory of the Products held by Licensee within thirty (30) days of the Termination Date.  MG shall pay the Licensee for all products so repurchased (if received in new and re-saleable condition) an amount equal to the price paid by the Licensee to MG, less a restocking charge of fifteen percent (15%) of such price.  Upon receipt of any products so reacquired from the Licensee, MG shall issue an appropriate credit to the Licensee's account.

**10.   INDEMNIFICATION AND RELATIONSHIP OF PARTIES**.

10.01.   Indemnification.   Licensee agrees to protect, defend, indemnify, and hold MG and its clients, affiliates, their directors, officers, shareholders, employees, and agents jointly and severally, harmless from and against all claims, actions, proceedings, damages, costs, expenses, and other losses (including death) and liabilities, consequently, directly, or indirectly incurred (including, without limitation, attorneys', accountants' and other related fees) as a result of, arising out of, or connected with the operation of the Licensed Location(s) or use of the Licensed IP.  The indemnity provisions herein this Section shall not apply to product liability claims.

10.02.   Relationship of Parties.  The relationship of MG and Licensee is that of a licensor and licensee.  Nothing in this Agreement will be construed to create a partnership, joint venture, or agency, and neither party to this Agreement will be liable for the debts or obligations of the other.

**11.   NOTICES.**    Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be effective when received, and shall be sufficient if given in electronic mail or writing, hand-delivered, sent by facsimile, sent by First Class Mail, return receipt requested (for all types of correspondence), postage prepaid, or sent by overnight courier service to the addresses set forth herein.

**12.   SURVIVAL**.  Sections 1.02, 1.03, 5, and 6 shall survive any termination of this Agreement.

**13.   GOVERNING LAW**.         This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of California. Any legal suit, action or proceeding arising out of or related to this Agreement or the matters contemplated hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of California, in each case located in the city of Los Angeles and County of Los Angeles, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding and waives any objection based on improper venue or *forum non conveniens*.  In the event of any legal suit, action, or proceeding brought within the state courts of the State of California, such disputes will be adjudicated at the North Valley District Chatsworth Courthouse located in Chatsworth, California.  Service of process, summons, notice or other document by mail to such Party's address as specified in this Agreement shall be effective service of process for any suit, action or other proceeding brought in any such court. International Licensees hereby expressly guarantee that they have an agent of process located within the United States, whose mailing address is listed herein.

**14.   SEVERABILITY & CONSTRUCTION**.

14.01.   Severability.  If any part, article, paragraph, sentence, or clause of this Agreement is held to be indefinite, invalid, or otherwise unenforceable, the entire Agreement will not fail on account of the holding, and the balance of this Agreement will continue in full force and effect.

14.02.   Construction.  All terms and words used herein shall be construed to include the number and gender as the context of this Agreement may require.  The parties agree that each section of this Agreement shall be construed independently of any other section or provision of this

 Initials

Agreement.  As used in this Agreement, the words "include," "includes," or "including" are used in a non-exclusive sense.   Articles and Section titles used in this Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions or conditions in this Agreement.

**15.  ENTIRE AGREEMENT& AMENDMENT**.        This Agreement, including any exhibits and schedules attached hereto contains the entire agreement of the parties and supersedes any prior written or oral agreements between the parties and may only be modified by a writing executed by the parties.

**16.  SUBMISSION OF AGREEMENT.**  Submission of this Agreement by MG to Licensee does not constitute an offer to distribution.  This License   Agreement   shall   become   effective   only   upon   full   execution   and   delivery   thereof   by   MG   to   Licensee.

4

_____ Initials

DocuSign Envelope ID: 5011BCD6-0FC1-4A44-8142-7088426B0088

**GUARANTY OF LICENSEE'S AGREEMENT**

In consideration of, and as an inducement to, the execution of the foregoing Right to Sell Licensing Agreement by Mazal Group Inc. ("MG"), the undersigned ("Guarantor") hereby jointly and severally guarantees unto MG that ("Licensee") will perform and/or pay each and every covenant, payment, agreement, obligation, liability and undertaking on the part of Licensee contained and set forth in or arising out of such Right to Sell Licensing Agreement, and every other agreement signed by the Licensee with MG (the "Obligations").

MG, its successors and assigns, may from time to time, without notice to the Guarantor (a) resort to the Guarantor for payment of any or all of the Obligations of the Licensee to MG, whether or not MG or its successors have resorted to any property securing any of the Obligations or proceeded against any Guarantor or any party primarily or secondarily liable on any of the Obligations; (b) release or compromise any Obligation of the Licensee or of any Guarantor hereunder or any Obligations of any party or parties primarily or secondarily liable on any of the Obligations; and (c) extend, renew, or credit any of the Obligations of the Licensee to MG for any period (whether or not longer than the original period), alter, amend, or exchange any of the Obligations, or give any other form of indulgence, whether under the Right to Sell Licensing Agreement or not.

Each Guarantor further waives presentment, demand, notice of dishonor, protest, nonpayment and all other notices whatsoever, including without limitation: notice of acceptance hereof; notice of all contracts and commitments; notice of the existence or creation of any liabilities under the foregoing Right to Sell Licensing Agreement and other agreement and of the amount and terms thereof; and notice of all defaults, disputes, or controversies between Licensee and MG resulting from such Right to Sell Licensing Agreement, other agreements or otherwise, and the settlement, compromise or adjustment thereof.

Guarantor jointly and severally agrees to pay all expenses paid or incurred by MG in attempting to enforce the Obligations and this Guaranty against Licensee and against Guarantor and in attempting to collect any amounts due thereunder and hereunder, including reasonable attorneys' fees if such enforcement or collection is by or through an attorney-at-law.  Any waiver, extension of time or other indulgence granted from time to time by MG or its agents, successors or assigns, with respect to the foregoing Obligations, shall in no way modify or amend this Guaranty, which shall be continuing, absolute, unconditional and irrevocable.

If more than one person has executed this Guaranty, the term "Guarantor" as used herein shall refer to each such person, and the liability of each Guarantor hereunder shall by joint and severally and primary as sureties.

[SIGNATURE PAGE FOLLOWS]

5

_____ Initials

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement to become effective on the date it is executed by the last of Licensee or MG.

**MAZAL GROUP INC.**

By:  Shawn Oded

Date: 1/17/2017

Title:  General Manager

Signature:  *Shawn Oded*
704877F4201346C...

**Licensee**

Full Name:  Emmanuel Frost

Date: 1/17/2017

(Re) Seller's Permit #:

State:  NY

Signature:  *Emmanuel Frost*
8F28C4FE95224B0...

Title (Owner/Job Title):  Owner

Company Name:  Endicure Solutions LLC

Individual Address (No P.O. Boxes, including Street, City and State): 6060 Whitegate Crossing East Amherst, NY 14051

E-Mail:  emanfrost@gmail.com

Phone:  9544836451

**Guarantor**

Full Name:  Emmanuel Frost

Signature:  *Emmanuel Frost*
8F28C4FE95224B0...

Date: 1/17/2017

Individual Address (No P.O. Boxes, including Street, City and State):  6060 Whitegate Crossing East Amherst, NY 14051

E-Mail: Emanfrost@gmail.com

Phone:  9544836451

6

 Initials

**List of Marks**

| Mark | Class | Registration No. | Registration Date |
|---|---|---|---|
| LIONESSE | 003, 008, 035, 044 | 4355307 | June 18, 2013 |
| LIONESSE w/ design | 003, 008, 035, 044 | 4351471 | June 11, 2013 |
| LIONESSE w/ design | 003, 008, 035, 044 | 4355309 | June 18, 2013 |
| [Lion Head] design | 003, 008, 035, 044 | 4351473 | June 11, 2013 |

**MAZAL GROUP INC.**
**RIGHT TO SELL LICENSING AGREEMENT – PHYSICAL RETAIL ONLY**

This Right to Sell Licensing Agreement ("Agreement") is made by and between Mazal Group Inc. ("MG"), a California corporation with its principal place of business at 20255 Corisco Street, Chatsworth California 91311, and ___Emmanuel Frost_____ ("Licensee"), a(n) ___individual_____, with its principal place of business and/or residence at 6060 Whitegate Crossing, East Amherst, NY_ with 14051 reference to the following facts.

**RECITALS**

A.   MG, on behalf of its clients, provides licensees with access to high-end skincare and cosmetics products (the "Products" or "MG Products") for sale to retail customers through approved physical retail locations. As part of access to the Products, MG has license to use and sub-license various intellectual property and trade secrets associated with the ___Vine Vera_____ brand, including but not limited to the trademarks referenced in Exhibit A, to licensees ("Licensed IP") for use in the sale of MG Products at approved physical retail locations.

B.   Licensee operates a _____Retail Store / _____Kiosk / __x__Cart located at ("MG Licensed Location(s)" or "Licensed Location(s)"):

    a.   Eastern Hills Mall – Williamsville, NY_____

    b.   _____

    c.   _____

    d.   _____

    e.   _____

    f.   _____

C.   Licensee desires, upon the terms and conditions set forth herein, to obtain a license to sell, offer for sale, or otherwise advertise MG Products solely at the MG Licensed Location(s) expressly designated herein.  Licensee acknowledges that it is essential to the preservation of the integrity of the Licensed IP, and the goodwill of MG Products, that Licensee maintain and adhere to certain standards, procedures, and policies described hereinafter.

D.   MG is willing, upon the terms and conditions set forth herein, to license to Licensee the right to sell MG Products, as well as utilize the Licensed IP, at the MG Licensed Location(s) expressly designated herein.

NOW THEREFORE, in consideration of the promises and the mutual provisions herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**1.   GRANT OF RIGHT TO SELL.**
1.01.   Grant of Right to Sell. Subject to all of the terms and conditions herein, MG grants to Licensee the non-exclusive, non-transferrable, non-divisible, and revocable license to use the Licensed IP and right to sell, offer for sale, or otherwise advertise MG Products solely at the MG Licensed Location(s) listed in this Agreement.  Licensee may not change the Licensed Location(s), except with MG's prior written consent, which MG may grant or withhold in its sole discretion. Regardless of whether the Licensee changes its Licensed Location(s), it will remain obligated for all liabilities and obligations arising out of or in connection with any prior locations.

1.02.   Authorized Products.  Licensee shall only sell, offer for sale, or otherwise advertise at the MG Licensed Location(s) MG Products which Licensee has purchased directly from MG.  Sale, offers for sale, or advertising at the Licensed Location(s) of any MG Products acquired through any other means by Licensee is strictly prohibited and considered a material breach of this Agreement.

1.03.   Authorized Sales Channels.  Licensee shall only sell, offer for sale, or otherwise advertise MG Products at the MG Licensed Location(s). Sale, offers for sale, or advertisement of MG Products via other sales channels including, but not limited to online, wholesale or distribution channels, or transfer of bulk quantities of Products at reduced cost is strictly prohibited and considered a material breach of this Agreement.  **This Agreement is only for retail sales direct to end-use consumers at the Licensed Location(s). Licensee is not authorized to sell, list, advertise or otherwise market MG Products online, either directly or indirectly.  Licensee is not authorized to sell MG Products to other resellers, wholesalers, bulk quantity purchasers at reduced cost, or any other person, company, or entity other than sales direct to end-use consumers at the Licensed Location(s).  Licensee is not authorized to sell, list, advertise or otherwise market MG Products in bulk quantities at reduced cost to end-use consumers at the Licensed Location(s)**. Any sale, offers for sale, or advertising of (i) MG Products at an unauthorized location other than the Licensed Location(s); (ii) MG Products online, either directly or indirectly; (iii) MG Products to another reseller, wholesaler or similar purchaser of bulk quantities at reduced cost; or (iv) MG Products obtained through unauthorized channels of distribution other than MG (each of (i), (ii), (iii), and (iv) an "Unauthorized Sale"), shall be considered a material breach of this Agreement and may expose Licensee to damages at law, equity, including but not limited to the liquidated damages provision contained in this Agreement.

Licensee shall operate the MG Licensed Location(s) in conformity with all applicable laws and regulations.  As part of this Section, but not in limitation of, Licensee shall undertake to maintain at its own expense and responsibility any and all product certification requirements as are necessary for the lawful sale of all Products.

**2.   TERM**.         This Agreement shall take effect upon the Effective Date and its term shall extend until terminated pursuant to **Section 8** hereof.

**3.   LICENSED IP/MARKETING MATERIALS**.         Licensee expressly acknowledges that MG is the sole and exclusive licensor of the Licensed IP. Licensee's rights of usage under this Agreement only extend to the Licensed IP for the sole purpose of promoting or facilitating Licensee's sale of MG Products exclusively within the MG Licensed Location(s) specified herein.  In no event shall this license to Licensee extend to

Initials

display, upload, or other use of the Licensed IP in connection with any website, social media account, or other online presence used by Licensee. Licensee shall not represent in any manner that Licensee has acquired any ownership rights in the Licensed IP, and shall designate the Licensed IP with any ownership notices as may be prescribed by MG from time to time. Licensee shall not use any of the Licensed IP or any marks, names, or indicia which are or may be confusingly similar to the Licensed IP in Licensee's own entity or business name.  Licensee shall not apply for or register any copyrights, trademarks, domain names, or any other official government filings for any marks, names, or indicia which are or may be confusingly similar to the Licensed IP.  Licensee further acknowledges and agrees that any and all goodwill associated with the MG Products, and identified by the Licensed IP shall inure directly and exclusively to the benefit of their respective owners as communicated by MG and that, upon the expiration or termination of this Agreement for any reason, no monetary amount shall be assigned as attributable to any goodwill associated with Licensee's use of the Licensed IP.  Licensee understands and agrees that any use of the Licensed IP other than as expressly authorized by this Agreement, without MG's prior written consent, is an infringement and material breach of MG and their respective Licensed IP owners' rights therein and that the right to use the Licensed IP granted herein does not extend beyond the termination or expiration of this Agreement

Licensee shall make full use of all advertising, marketing, and promotional material supplied directly by MG. Licensee shall not be permitted to use any advertising, marketing, or promotional material not directly supplied by MG without MG's prior express written consent.   In all advertising and promotion of the MG Products, Licensee shall comply with MG's standard advertising policies and requests as may be specified from time to time, including but not limited to the exclusion from use of specific advertising, marketing, or promotional materials even if such materials were originally supplied to Licensee by MG.  Licensee shall bear all the advertising, marketing, and promotion costs and all business expenses incurred by it in marketing, promoting, advertising and selling the MG Products.

4.    **MINIMUM ADVERTISED PRICING (MAP)**.        From time to time MG may establish minimum advertised pricing for certain Products, for certain customers and/or for certain situations. Licensee shall adhere to such minimum advertised pricing as so established by MG ("MAP Guidelines"), including but not limited to prices advertised by MG on its corporate website, provided that Licensee shall not be required to sell Products at any particular price or at or above any minimum price if such a requirement would be unlawful.

5.    **PRODUCT SERIAL NUMBERS**.        Licensee hereby acknowledges that any or all MG Products may be marked with a unique serial number for tracking and enforcement purposes, and expressly agrees that certain Products and serial numbers may be directly assigned to Licensee. Licensee further acknowledges that tampering with Product serial numbers is a criminal offense punishable by fine and imprisonment.  MG reserves the right to divulge any counterfeit or tampered products to law enforcement channels when required.  Licensee shall not in any manner or form tamper with any MG Products sold to Licensee, including but not limited to the alteration or concealment of Product serial numbers. *LICENSEE HEREBY ACCEPTS FULL RESPONSIBILITY AND LIABILITY FOR ANY PRODUCT WITH LICENSEE'S ASSIGNED SERIAL NUMBER(S) THAT IS TAMPERED WITH OR SOLD THROUGH UNAUTHORIZED CHANNELS, INCLUDING BUT NOT LIMITED TO, SALES IN VIOLATION OF SECTIONS 1.02 AND 1.03 OF THIS AGREEMENT*.

6.    **CONFIDENTIALITY OF INFORMATION**.        Licensee, for itself, its employees, contractors, consultants, and agents, agrees to: (a) safeguard MG's Confidential Information with the same degree of care that Licensee uses to protect its own confidential information; (b) maintain the confidentiality of this information; (c) not use such information except as permitted under this Agreement; and (d) not disseminate, disclose, sell, publish, or otherwise make available this information to any third party without the prior written consent of MG.

For purposes of this Agreement, "Confidential Information" shall mean any and all information that is not publicly known, and that is disclosed to or discovered by Licensee in any form including but not limited to Trade Secrets, website designs, layouts, design concepts, trademarks, discoveries, ideas, facts, product development strategy and activity, corporate assessments and strategic plans, customer lists, financial and statistical information, accounting information, systems, processes, formulae, inventions, product specifications, data, know-how, graphs, samples, research and development, distribution methods, customer requirements, price lists, market studies, business plans, marketing plans, marketing methods, discoveries, policies, guidelines, procedures, practices, financial statements, projections, budgets, licenses, agreements, contracts, leases, surveys and marketing plans and information of MG. "Trade Secret" shall mean any information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, and shall include but is not limited to each of the following: Unique vendor information, customer lists, business methods, pricing information, product information, profit margin information, financial information, overhead information, cost information, purchasing information, personnel information, data compilations, processes, systems, cost information, designs, patterns, drawings, business relationships, business plans, business methods, manufacturing techniques, and manufacturing methods provided to Licensee by MG or discovered by Licensee by virtue of its relationship with MG whether such information is expressly disclosed to Licensee or otherwise.

7.    **TRANSFER AND ASSIGNMENT**.

7.01.    <u>Assignment by MG</u>. This Agreement and all rights and duties hereunder may be freely assigned or transferred by MG and shall be binding upon and inure to the benefit of MG's successors and assigns.

7.02.    <u>Transfer by Licensee</u>. Licensee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Licensee and that MG has granted the License in reliance on Licensee's personal background, business skills, experience, and financial capacity, it is important to MG that Licensee be known to MG and always meet MG's standards and requirements. Accordingly, Licensee shall not be permitted or have the power, without the prior written consent of MG, to make any Transfer or assignment.

Any Transfer that does not comply with the terms of this Section 7 shall be null and void.

8.    **DEFAULT AND TERMINATION**.

8.01.    <u>Termination by the Parties</u>. MG may terminate this Agreement at any time, for any and/or no reason, by providing written notice to Licensee of such termination.  Such termination by MG is effective immediately upon written notice being given to Licensee pursuant to Section 11 herein.  Licensee may terminate this Agreement upon two (2) months prior written notice to MG, so long as Licensee, up until the point of its written notice to MG, has fully performed on all its obligations under this Agreement and has not been in default or material breach of this Agreement.

8.02.    <u>Material Breach/Default by Licensee</u>. Without in any way limiting MG's termination rights in Section 8.01, or the general meaning of the terms "material breach" or "default," the following non-exhaustive list of occurrences shall constitute a material breach and/or default by Licensee allowing MG to terminate the Agreement and be entitled to the remedies outlined in Section 8.03:

8.02.1.    If Licensee makes, or has made, any false statement or report to MG in connection with this Agreement or the application therefore;

2



Initials

8.02.2.   If License sells, offers for sale, advertises, or gives away any MG Products via online or other physical locations aside from the Licensed Location(s) defined in this agreement;

8.02.3.   If License sells, offers for sale, advertises, or gives away any MG Products to non end-use retail consumers including, but not limited to, wholesalers, distributors, or consumers purchasing bulk quantities at reduced cost;

8.02.4.   If Licensee engages in any Unauthorized Sale as defined in Section 1 of this Agreement; or

8.02.5.   If Licensee sells, offers for sale, advertises, or gives away any MG Products in violation of the MAP Guidelines as specified in Section 4 of this Agreement.

8.03.   Remedies to MG/Liquidated Damages.   If the Licensee is in default, in addition to the rights MG has to terminate the Agreement, the Licensee agrees to pay MG, among the many remedies available to MG (which MG does not waive by the exercise of any rights hereunder), a payment of $100,000.00 USD as liquidated damages.   Licensee and MG agree that these liquidated damages represent a reasonable estimate of MG's costs, expenses, and other damages and are a fair compensation to MG for the loss suffered by MG as a direct and proximate cause of Licensee's default.   MG shall be entitled to retain and have recourse to any bond, deposit, credit or advance previously deposited by Licensee under this Agreement to fulfill any liquidated damages MG is entitled to under this Section 8.03.

**BY INITIALING HERE** ____ , **LICENSEE ACKNOWLEDGES AND MAKES A PERSONAL GUARANTEE OF THE REASONABLENESS OF THIS SECTION AND THE ABILITY OF MAZAL GROUP TO SEEK ADDITIONAL RELIEF IF DEEMED APPROPRIATE FROM LICENSEE, OWNERS, OR ANY GUARANTORS.**

8.04.   Governing State Law.   If a different notice or cure period or default is prescribed by applicable California law, it shall apply to a termination of this Agreement.

8.05.   Waiver.   No failure on the part of the MG to exercise any power reserved to it by this Agreement or to insist on strict compliance with any obligation or condition under this Agreement will be considered to be a waiver of the right to exercise the power or to insist on compliance with the obligation or condition in the future.

**9.   POST TERMINATION OBLIGATIONS**.

9.01.   Post-Termination Obligations.   Upon the Termination of this Agreement by any means or for any reason, Licensee shall immediately:

9.01.1.   Discontinue all promotion, marketing and advertisement of the Products;

9.01.2.   Cease all display, advertising, and use of all Licensed IP related names, trademarks, logos, designations, and the Licensed IP, and agree to thereafter refrain from use, advertisement, or display such names, trademarks, logos, designations, or Licensed IP;

9.01.3.   Pay all sums owing to MG, with all outstanding invoices for Products accelerating and becoming immediately due and payable. Upon termination for any default by Licensee, such sums shall also include liquidated damages as specified in **Section 8**.   MG reserves the right to hold funds until the liquidated damages amount is completely paid, and can use such funds to offset the liquidated damages amount pursuant to Section 8.03 of this Agreement; and

9.01.4.   Notify MG of any orders or portions thereof remaining unshipped as of the effective date of the termination.   MG shall have the option to cancel all such orders or portions thereof.

9.02.   Right to Repurchase.   MG shall have the right, but not the obligation, to repurchase any amount of the entire remaining uncommitted inventory of the Products held by Licensee within thirty (30) days of the Termination Date.   MG shall pay the Licensee for all products so repurchased (if received in new and re-saleable condition) an amount equal to the price paid by the Licensee to MG, less a restocking charge of fifteen percent (15%) of such price.   Upon receipt of any products so reacquired from the Licensee, MG shall issue an appropriate credit to the Licensee's account.

**10.   INDEMNIFICATION AND RELATIONSHIP OF PARTIES**.

10.01.   Indemnification.     Licensee agrees to protect, defend, indemnify, and hold MG and its clients, affiliates, their directors, officers, shareholders, employees, and agents jointly and severally, harmless from and against all claims, actions, proceedings, damages, costs, expenses, and other losses (including death) and liabilities, consequently, directly, or indirectly incurred (including, without limitation, attorneys', accountants' and other related fees) as a result of, arising out of, or connected with the operation of the Licensed Location(s) or use of the Licensed IP.   The indemnity provisions herein this Section shall not apply to product liability claims.

10.02.   Relationship of Parties.   The relationship of MG and Licensee is that of a licensor and licensee.   Nothing in this Agreement will be construed to create a partnership, joint venture, or agency, and neither party to this Agreement will be liable for the debts or obligations of the other.

**11.   NOTICES.**     Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be effective when received, and shall be sufficient if given in electronic mail or writing, hand-delivered, sent by facsimile, sent by First Class Mail, return receipt requested (for all types of correspondence), postage prepaid, or sent by overnight courier service to the addresses set forth herein.

**12.   SURVIVAL**.   Sections 1.02, 1.03, 5, and 6 shall survive any termination of this Agreement.

**13.   GOVERNING LAW**.         This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of California. Any legal suit, action or proceeding arising out of or related to this Agreement or the matters contemplated hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of California, in each case located in the city of Los Angeles and County of Los Angeles, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding and waives any objection based on improper venue or *forum non conveniens*.   In the event of any legal suit, action, or proceeding brought within the state courts of the State of California, such disputes will be adjudicated at the North Valley District Chatsworth Courthouse located in Chatsworth, California.   Service of process, summons, notice or other document by mail to such Party's address as specified in this Agreement shall be effective service of process for any suit, action or other proceeding brought in any such court. International Licensees hereby expressly guarantee that they have an agent of process located within the United States, whose mailing address is listed herein.

**14.   SEVERABILITY & CONSTRUCTION**.

14.01.   Severability.   If any part, article, paragraph, sentence, or clause of this Agreement is held to be indefinite, invalid, or otherwise unenforceable, the entire Agreement will not fail on account of the holding, and the balance of this Agreement will continue in full force and effect.

14.02.   Construction.   All terms and words used herein shall be construed to include the number and gender as the context of this Agreement may require.   The parties agree that each section of this Agreement shall be construed independently of any other section or  provision of this

3


Initials

DocuSign Envelope ID: EA251399-0D64-4296-AB3C-72B2BDB262DB

Agreement.  As used in this Agreement, the words "include," "includes," or "including" are used in a non-exclusive sense.   Articles and Section titles used in this Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions or conditions in this Agreement.

**15.  ENTIRE AGREEMENT& AMENDMENT**.        This Agreement, including any exhibits and schedules attached hereto contains the entire agreement of the parties and supersedes any prior written or oral agreements between the parties and may only be modified by a writing executed by the parties.

**16.  SUBMISSION OF AGREEMENT.**  Submission of this Agreement by MG to Licensee does not constitute an offer to distribution.  This License   Agreement   shall   become   effective   only   upon   full   execution   and   delivery   thereof   by   MG   to   Licensee.

4

Initials

DocuSign Envelope ID: EA251399-0D64-4296-AB3C-72B2BDB262DB

**GUARANTY OF LICENSEE'S AGREEMENT**

In consideration of, and as an inducement to, the execution of the foregoing Right to Sell Licensing Agreement by Mazal Group Inc. ("MG"), the undersigned ("Guarantor") hereby jointly and severally guarantees unto MG that ("Licensee") will perform and/or pay each and every covenant, payment, agreement, obligation, liability and undertaking on the part of Licensee contained and set forth in or arising out of such Right to Sell Licensing Agreement, and every other agreement signed by the Licensee with MG (the "Obligations").

MG, its successors and assigns, may from time to time, without notice to the Guarantor (a) resort to the Guarantor for payment of any or all of the Obligations of the Licensee to MG, whether or not MG or its successors have resorted to any property securing any of the Obligations or proceeded against any Guarantor or any party primarily or secondarily liable on any of the Obligations; (b) release or compromise any Obligation of the Licensee or of any Guarantor hereunder or any Obligations of any party or parties primarily or secondarily liable on any of the Obligations; and (c) extend, renew, or credit any of the Obligations of the Licensee to MG for any period (whether or not longer than the original period), alter, amend, or exchange any of the Obligations, or give any other form of indulgence, whether under the Right to Sell Licensing Agreement or not.

Each Guarantor further waives presentment, demand, notice of dishonor, protest, nonpayment and all other notices whatsoever, including without limitation: notice of acceptance hereof; notice of all contracts and commitments; notice of the existence or creation of any liabilities under the foregoing Right to Sell Licensing Agreement and other agreement and of the amount and terms thereof; and notice of all defaults, disputes, or controversies between Licensee and MG resulting from such Right to Sell Licensing Agreement, other agreements or otherwise, and the settlement, compromise or adjustment thereof.

Guarantor jointly and severally agrees to pay all expenses paid or incurred by MG in attempting to enforce the Obligations and this Guaranty against Licensee and against Guarantor and in attempting to collect any amounts due thereunder and hereunder, including reasonable attorneys' fees if such enforcement or collection is by or through an attorney-at-law.  Any waiver, extension of time or other indulgence granted from time to time by MG or its agents, successors or assigns, with respect to the foregoing Obligations, shall in no way modify or amend this Guaranty, which shall be continuing, absolute, unconditional and irrevocable.

If more than one person has executed this Guaranty, the term "Guarantor" as used herein shall refer to each such person, and the liability of each Guarantor hereunder shall by joint and severally and primary as sureties.

[SIGNATURE PAGE FOLLOWS]

5



DocuSign Envelope ID: EA251399-0D64-4296-AB3C-72B2BDB262DB

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement to become effective on the date it is executed by the last of Licensee or MG.

**MAZAL GROUP INC.**

By:  Shawn Oded

Date: 1/10/2017

Title:  General Manager

Signature:  *Shawn Oded*
704877F4201346C...

**Licensee**

Full Name:  Emmanuel Frost

Date: 1/10/2017

(Re) Seller's Permit #:

State:  New york

Signature:
8F28C4FE95224B0...

Title (Owner/Job Title):  Owner

Company Name:  Frost Solutions

Individual Address (No P.O. Boxes, including Street, City and State):  6060 whitegate Crossing

E-Mail:  Emanfrost@gmail.com

Phone:  9544836451

**Guarantor**

Full Name:  Emmanuel Frost

Signature:
8F28C4FE95224B0...

Date: 1/10/2017

Individual Address (No P.O. Boxes, including Street, City and State):  6060 whitegate crossing.

E-Mail: Emanfrost@gmail.com

Phone:  9544836451

6


Initials

**List of Marks**

| Mark | Class | Registration No. | Registration Date |
| --- | --- | --- | --- |
| VINE VERA | 003 | 4310854 | August 20, 2013 |
| VINE VERA | 003 | 4447286 | December 10, 2013 |
| V logo | 003 | 4450665 | December 17, 2013 |
| VINE VERA | 003 | 4447287 | December 10, 2013 |